Katelyn D. Skinner, OSB No. 105055
Katrina Seipel, OSB No. 164793
Buckley Law, P.C.
5300 Meadows Road, Suite 200
Lake Oswego, OR 97035
Telephone: 503-620-8900
Fax: 503-620-4878
Emails: kds@buckley-law.com
         kas@buckley-law.com
Of Attorneys for Respondent Spirit Bridger

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

Portland Division

In re the Application of:

ANDREW CHARLES NISBET,

Case No.: 3:23-cv-00850-IM

      Petitioner,

   and

**RESPONDENT'S TRIAL MEMORANDUM**

SPIRIT ROSE BRIDGER,

      Respondent.

---

*The Convention on the Civil Aspects of International Child Abduction*
*Done at the Hague on 25 Oct 1980*
*International Child Abduction Remedies Act, 22 USC § 9001 et seq.*

Respondent Spirit Bridger ("Mother"), by and through her attorney of record, Katrina

Seipel, submits this Trial Memorandum to the Court in anticipation of the trial on this matter,

scheduled to take place October 16-18, 2023.

Petitioner Andrew Nisbet ("Father") has filed a Verified Petition for Return of

Children to their Habitual Residence ("Petition"), seeking the return of the parties' two minor

children, ACN, age 5, and KRN, age 3, to Scotland. Father's Petition is without merit, and this

Court should decline to return the children to Scotland. Father cannot prove his *prima facie* case and, even if Father does prove his *prima facie* case, multiple defenses to an action brought pursuant to the Hague Convention apply in this matter, as elaborated on below.

## SUMMARY OF FACTS

Mother and Father began their relationship in 2012, meeting online. At the time, Father was living in Scotland, and Mother was living in Oregon. In late 2012, Mother relocated to Scotland to be with Father. While Father worked as a radiologist, Mother was mostly unemployed. The pair moved to New Zealand for Father's work in 2014, but they returned to Scotland in 2015. In 2017, while still living in Scotland, Mother became pregnant, and problems between the parties began to arise.

Father began immediately pressuring his parents to agree to let him, Mother, and their baby permanently reside in the home, located in on the island of Jersey, off the coast of France. Father was obsessed with making his parents' home his own family's home. When Father's parents continued to resist his efforts to permanently move his family into their house, in November 2017, Father attempted to kill himself by way of injecting air into his veins. Immediately after recovering from this incident, Father, once again, tried to persuade his parents to, essentially, give up their quiet, retired life and let their mentally ill adult son and his family move in with them.

Father's parents relented, though they made clear that Mother's and Father's stay at the home would be temporary, and Mother and Father moved in with Father's parents in late 2017. As Mother's due date approached, Father became panicked over the state of his parents' home, and in January 2018, he tried a second time to kill himself by throwing

himself out of a second story window onto a concrete patio. Father sustained serious injuries, including shattered feet and ankles and a spine injury, leaving Mother to give birth and care for an infant on her own.

In early February, 2018, the parties' first child, ACN, was born. Due to the continued tension and stress at Father's parents' home in Jersey, Mother and Baby ACN retreated to Scotland six months after ACN's birth. Yet, another six months later, Father convinced Mother to return with the baby to his parents' home, assuring her the family matters were resolved.

In the summer of 2019, Mother once again became pregnant, and, it turned out, the family issues were nowhere near resolution. Throughout the coming months, seeing no resolution in sight, Mother packed bags for a return to Oregon and discussed the same with Father. Then, on August 2, 2019, Mother and Father were served with an eviction notice from Father's parents. Father, being unable to control the situation and his rage, stabbed and killed his mother on August 6, 2019. Father was arrested shortly after the incident. Mother and ACN were taken to a refuge in Jersey. Father's family immediately severed all contact.

After spending two weeks in the refuge, a very pregnant Mother and Baby ACN moved to a halfway house in Jersey. While at the refuge and halfway house, Mother actively considered fleeing back to Oregon immediately, but she knew she was on the verge of giving birth, and she did not yet have health insurance in the United States. Thus, in late 2019, Mother moved herself and ACN back to Scotland, with the intention of having her second baby and preparing for a move back to the United States. Mother no longer had a partner in the UK. She had no support system, no employment, and no home. Throughout her years

with Father, Mother's living accommodations were always temporary, and she was ready to bring her children back to her home in Oregon, where she has significant support. Mother made Father aware of her intentions.

In late February, 2020, at the beginning of the COVID outbreak, Baby KRN was born. As Mother recovered from birth in the hospital, airlines were cancelling flights and borders were actively closing. Before Mother was able to get an appointment to obtain KRN's American paperwork (her CRBA and passport), the United States Consulate located in Edinburgh shut down. Knowing very well she would need Father's signature to obtain the American paperwork for KRN, in the following months, Mother maintained a civil relationship with Father. She complied with his demands for daily phone calls, some of which lasted more than 8 hours. She obeyed him by assisting him with various matters concerning his bank accounts, property, communications with lawyers, and issues at his numerous institutions. Father wrote letters as if they were written by Mother, and he made Mother send them. He even coerced Mother into creating a PDF of her signature and sending it to him for later use. If Mother ever gave pushback or refused to engage for any extended period of time, Father would threaten Mother and the children.

After Father was taken into custody for killing his mother, he had limited contact with the children. ACN was speaking no more than a few words, and KRN was an infant. Father Skyped with the children from time to time, but the children treated these calls like an interactive television program. At Father's demand, and only after extensive paperwork was completed, Mother visited Father in person with ACN in November 2019. Mother visited Father in person with both children in June, July, and December 2021. At the December

2021 visit, Father signed the paperwork Mother needed to obtain KRN's American documentation, knowing full well Mother planned to return to Oregon with the children.

Since killing his mother and being in custody, Father has continuously tried to coerce Mother into staying in the UK so they could "be a family". Despite his criminal conviction, Father's obsession with "family" remains, and anyone who acts in any way contrary to Father's view of "family" is at risk of experiencing Father's tremendous capacity for violence, just as Father's mother, unfortunately, fell victim to.

On June 17, 2022, Mother was finally able to escape her long-time abuser and relocate herself and the children to Oregon, where they now have a great support system and life.

APPLICABLE LAW AND ARGUMENT

## I.      Petitioner's *prima facie* case

In adopting the Hague Convention, the signatory nations seek "to protect children internationally from the harmful effects of their wrongful removal or retention . . . " Convention on the Civil Aspects of International Child Abduction (Concluded 25 October 1980), preamble. As such, the Convention applies only when there has been a wrongful removal or retention of children. Under Article 3 of the Convention, a removal or retention is considered wrongful when it is in breach of a parent's rights of custody, actually being exercised, under the law of the State the children were habitually resident in immediately prior to the removal or retention. The burden to establish a wrongful removal or retention falls on the petitioner and must be proved by a preponderance of the evidence. 22 U.S.C. §

9003(e)(1)(A). If the petitioner meets his burden, the burden then shifts to the respondent to prove an affirmative defense.

In analyzing the petitioner's *prima facie* case, the Court must make four determinations, in order:

A. Determine "when the removal or retention took place"

B. Determine "the child's habitual residence immediately prior to such removal or retention"

C. Determine "whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence"

D. Determine "whether the petitioner was exercising his or her custody rights at the time of removal or retention"

*Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270-71 (3d Cir. 2007).

**A. When the removal or retention took place**

Respondent admits and acknowledges she and the children left Scotland on June 17, 2022, and this is the date that should be considered by the Court.

**B. The child's habitual residence immediately prior to such removal or retention**

Petitioner claims that Scotland was the children's habitual residence prior to them relocating to Oregon. In determining a child's habitual residence, the Court must consider the totality of the circumstances specific to the case, not categorical requirements such as an actual agreement between the parents. *Monasky v. Taglieri*, 140 S. Ct. 719, 728 (2020). A child's residence can be deemed "habitual" only when the residence is more than transitory. *Id.* at

726. What makes the child's residence habitual is some degree of integration by the child into a family and social environment. *Id.* Courts must be sensitive to the unique circumstances of the case and informed by common sense. *Id.* at 727. "[S]uppose, for instance, that an infant lived in a country only because a caregiving parent had been coerced into remaining there. Those circumstances should figure in the calculus." *Id.* Moreover, the Third Circuit has held that where parental conflict is contemporaneous with the birth of a child, no habitual residence may ever come into existence. *Delvoye v. Lee*, 329 F.3d 330 (3d Cir. 2003). If the Court concludes that the country from which the child was removed was not the country of the child's habitual residence, the Convention does not apply, and the petition must be dismissed. *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001).

Scotland was not the children's habitual residence before they came to the United States in June 2022. Though they lived there with Mother for some time, they did so solely because (1) the COVID-19 pandemic closed the U.S. Consulate and resulted in closed borders and (2) Father's coercion and control of Mother kept her and the children in place. Mother always maintained an address in Oregon, and the residence in Scotland was always meant to be temporary, transitory. Due to Father's criminal actions, the children were forced into a secluded and lonely life in Scotland, not an integrated one the habitual residence standard considers. The children, and Mother alike, had no habitual residence prior to coming to Oregon, and, thus, this petition must be dismissed.

///

///

///

**C. Whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence**

Even if the Court finds that Scotland was the children's habitual residence as Father claims, the removal of the children to Oregon did not breach Petitioner's rights of custody under the law of Scotland. Petitioner has not and will not be able to prove he had rights of custody under the law of Scotland on June 17, 2022, when he was in custody for killing his mother, for an indefinite period of time. The Ninth Circuit has held that a court should review more skeptically an assertion as to the contents of foreign law if, for example, it was provided by a party's own attorney. *Shalit v. Coppe*, 182 F.3d 1124 (9th Cir. 1999). Other than statements of his counsel, Father has put forth no evidence of Scotland law as it pertains to parental custodial rights, and he, therefore, has not met his burden in this regard.

**D. Whether the petitioner was exercising his or her custody rights at the time of removal or retention**

Whether a petitioner was indeed exercising his custody rights at the time of removal is, generally, liberally construed. However, "acts that constitute clear and unequivocal abandonment of the child" can cause a petitioner with valid custody rights to be deemed as having failed to exercise those rights under the Hague Convention. *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996). Father committed murder, and he plead guilty to the crime. He accepted a sentence of an indefinite time period. He agreed to being locked away in a psychiatric facility, away from Mother and the children. If Father's acts do not constitute "clear and unequivocal abandonment of the child", what does?

///

## II.    Respondent's affirmative defenses

Where a petitioner establishes his *prima facie* case of wrongful removal or retention, the burden then shifts to the respondent to establish an exception to return. 22 U.S.C. § 9003(e)(2)(A).

### A. Consent

Article 13(a) of the Convention establishes that a petitioner's consent to the removal or retention is an exception to the required return of the child. Neither the Convention nor ICARA define "consent". Thus, to determine whether a petitioner consented under Article 13(a), courts look to a petitioner's statements and conduct, and evaluate what the petitioner contemplated and agreed to. *Padilla v. Troxell*, 850 F.3d 168 (4th Cir. 2017). Consent may be made expressly, or it may be implied from the petitioner's conduct. *Walker v. Walker*, 701 F.3d 1110, 1122 (7th Cir. 2012). The left-behind parent supplying the taking parent with required exit paperwork for a child, like a passport, should be taken into consideration. *Gonzalez-Caballero v. Mena*, 251 F.3d 789 (9th Cir. 2001).

In this case, Father, through his conduct, consented to the children making Oregon their home. As already reiterated, Father killed his own mother and plead guilty to the crime, thereby removing himself from the young children's lives. Mother discussed her plans with Father to make Oregon her and the children's permanent home, and Father, knowing Mother's intentions, signed KRN's American paperwork, the paperwork needed for KRN to be able to leave the country.

### B. Well settled

Article 12 of the Convention contains the well settled exception. It provides that, when

a period of one year or more has elapsed from the date of the wrongful removal, the Court has discretion whether or not to order a return. The one-year period to be considered is the date of the removal to the date of the commencement of the proceedings. ICARA provides that "commencement of the proceedings" means the filing of a petition for relief. 22 U.S.C. § 9003(f)(3).

Mother and the children came to Oregon on June 17, 2022. Father filed his petition on June 12, 2023. As such, under the letter of the law, the well settled defense does not apply here. However, Mother asks this Court to consider how well settled the children are here in analyzing the grave risk defense, which defense is elaborated on below.

In *Blondin v. Dubois*, the Court analyzed this very argument. 238 F.3d 153 (2d Cir. 2001). The Court, in discussing the framing of the Convention, stated that it was recognized "there could come a point at which a child would become so settled in a new environment that repatriation might not be in its best interest. Therefore, [the framers] settled on the one-year time limit, which, 'although perhaps arbitrary, nevertheless proved to be the "least bad" answer to the concerns which were voiced in this regard.'" *Id.* at 164. Understanding the time limit but also the arbitrariness of it, the Court established a connection between the fact that the children in the case were well settled, despite it having been less than one year, and the grave risk of harm they would face should they be returned. *Id.* at 165.

As of today's date, the children, with their Mother, the only parent they've ever known, have lived in Oregon for well over a year. Along with Mother, they live with a maternal uncle, and another of Mother's brothers lives just blocks away. The children have their own pet to love and care for. The children's maternal grandparents live in Montana, but the children are

close with them and visit often. They have a strong support network of other family and friends. They are set up in the social security system. They have health insurance through the Oregon Health Plan. They have a primary care physician. They have a dentist. Both children are enrolled in school. They frequent parks and they go swimming at least once each week. They have play dates and attend birthday parties. In sum, the children are thriving here in Oregon. They are so well settled here that tearing them from this environment would put them at great risk of harm.

**C. Grave risk of harm**

Perhaps of utmost importance to this case, the Court should not return the children to Scotland because doing so would expose the children to physical or psychological harm or otherwise place them in an intolerable situation. This affirmative defense is found in Article 13(b) of the Convention. The Perez-Vera Report[1] contains a considerable discussion of the history and purpose of the grave risk exception. Perez-Vera explains that "the interest of the child in not being removed from its habitual residence . . . gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation." Para. 29. ICARA provides that the respondent has the burden of establishing by clear and convincing evidence that Article 13(b) applies. 22 U.S.C. § 9003(e)(2)(A).

The Convention proclaims, "[T]he interests of children are of paramount importance in matters relating to their custody." Recognizing this, courts of the United States have denied returns on countless occasions. In *Baran v. Beaty*, the Eleventh Circuit held that the district

---

[1] https://assets.hcch.net/docs/a5fb103c-2ceb-4d17-87e3-a7528a0d368c.pdf

court was not required to find that the child had previously been physically or psychologically harmed; it was required to find only that returning him would expose him to such harm. 526 F.3d 1340 (11th Cir. 2008). In *Walsh v. Walsh*, the First Circuit concluded that, although the petitioner father had not directed his violence toward the children directly, his pattern of violence and disobedience of court orders was sufficient to find that the children would be in grave danger if they were returned. 221 F.3d 204 (1st Cir. 2000). There, the petitioner father "demonstrated that his violence knows not the bonds between parent and child or husband and wife, which should restrain such behavior." *Id.* at 220. The Court in *Walsh* simply recognized that exposure to any form of domestic abuse is a factor to be considered when analyzing a grave risk of harm defense.

Additionally, in analyzing whether a respondent has met his or her burden, the court should consider the environment of the country the child may be returned to. *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374 (8th Cir. 1995). The United Kingdom Supreme Court, in defining this defense and, specifically, what is meant by "intolerable situation", noted that "intolerable" is a strong word, but when it is applied to a child, it must mean a situation that a child should not be expected to tolerate. Re E [2011] UKSC 27 [2011] FLR 758.

To be blunt, it is entirely frivolous to argue that this defense does not apply. Because Father remains in custody, he is asking for the children to be returned to either Scotland's equivalent of child protective services or an adult other than himself whom the children do not even know. He is asking that the children be ripped away from their primary and only caregiver and be placed with a complete stranger. No child should be expected to tolerate such a situation. Father is mentally ill. He is a convicted murderer. He exhibits arrogance and a need

to be in control. Father's relationship with Mother can only be described as one of coercion and control, and, should the children be returned, they are at grave risk of experiencing the same, or worse. Father has proved he is violent, and he has proved he can and will continue exercising power over and control of his former partner. Quite to the contrary, he has not proved his case, and he will not do so at trial.

CONCLUSION

This Court must refuse to return ACN and KRN to Scotland and dismiss Father's Petition. First, Father is unable to prove that Scotland was the children's habitual residence. Second, Father is unable to prove that he had custody rights according to Scotland law at the time the children left Scotland. Third, Father is unable to prove that he was actually exercising any custodial rights. Fourth, Father consented to the children being removed from Scotland. Last, the children are well settled here in Oregon, and returning them to Scotland would expose them to a grave risk of harm or otherwise place them in an intolerable situation. Accordingly, Mother respectfully prays for her requested relief.

DATED: September 29, 2023

Katrina Seipel, OSB #164793
Of Attorneys for Respondent

## CERTIFICATE OF SERVICE

I certify that this document was served, by electronic service through the CM/ECF system and by email, upon Bradley Lechman-Su at bradley@bradleylechmansu.com on this 29th day of September, 2023.

Katrina Seipel, OSB #164793
Of Attorneys for Respondent
kas@buckley-law.com

CERTIFICATE OF SERVICE