Katelyn D. Skinner, OSB No. 105055
Katrina Seipel, OSB No. 164793
Buckley Law, P.C.
5300 Meadows Road, Suite 200
Lake Oswego, OR  97035
Telephone:  503-620-8900
Fax:  503-620-4878
Emails:  kds@buckley-law.com
         kas@buckley-law.com
Of Attorneys for Respondent Spirit Bridger

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| In re the Application of: | Case No.: 3:23-cv-00850-IM |
| ANDREW CHARLES NISBET, | |
| Petitioner, | |
| and | RESPONDENT'S CLOSING ARGUMENT |
| SPIRIT ROSE BRIDGER, | |
| Respondent. | |

The Convention on the Civil Aspects of International Child Abduction
Done at the Hague on 25 Oct 1980
International Child Abduction Remedies Act, 22 USC § 9001 *et seq.*

COMES NOW, Respondent Spirit Bridger, by and through her attorney of record Katrina Seipel, and submits the following written closing argument for the court's consideration:

<u>RESPONDENT'S CLOSING ARGUMENT</u>

On July 17, 2022, Ms. Bridger and her children moved home to Portland, Oregon. The word "moved" implies that they were leaving another home base, but that is simply not

the case here. Between September 2019 and June 2022, Scotland was not their "home"; it was a stopping ground, the only option they had, until they were able to move on. This isn't a case of "wrongful" removal of children, and it sure isn't child abduction.

Instead, this case is a case of drastic and disgusting domestic violence. And, for Mr. Nisbet, it is a case of excuse after excuse after excuse. There is so much that could be said about the evidence in this case, both how strong Ms. Bridger's was and how chaotic and, frankly, sad Mr. Nisbet's was, but I ask Your Honor, in weighing the evidence, to consider the evidence in the framework of the Hague Convention:

To start, in order for Your Honor to even consider returning these children to Scotland, you must first find that Mr. Nisbet has proved, by a preponderance of the evidence, his *prima facie* case. He simply has not done so. In analyzing Mr. Nisbet's prima facie case, there are four prongs that must be considered:

1. When the removal or retention took place
2. The children's habitual residence immediately prior to the removal
3. Whether the removal breached Mr. Nisbet's custody rights under the law of the children's habitual residence
4. Whether Mr. Nisbet was actively exercising his custody rights at the time of removal

First, there is no question here that Ms. Bridger and the children left Scotland and came to the United States on July 17, 2022.

Second, Mr. Nisbet argues that Your Honor should find that Scotland was the children's habitual residence prior to their coming to the United States. Mr. Nisbet clearly does not understand the law and the definition of "habitual residence". In analyzing the definition of "habitual residence", I ask Your Honor to carefully review the case law documented in Respondent's Trial Memorandum. To determine whether or not Scotland

was the children's habitual residence, one must look at the totality of the circumstances. In doing so, the evidence in this case clearly indicates that the children's residing in Scotland was temporary, transitory. The evidence clearly indicates that they had no degree of integration into a family and social environment. Between September 2019 and June 2022, the children had no contact with family in Scotland whatsoever. Their only family contact during that time was with Ms. Bridger's family in Oregon. Moreover, the children had no social life whatsoever during this time period. They attended nursery, but, to quote Ms. Bridger, "They didn't really have friends. If anything, C⬛ had enemies." Further, this was in the time of COVID. Our world was shut down. How can children socially integrate when we were all prohibited from socially integrating?

    Case law directs courts to use common sense in this analysis, and I ask Your Honor to do the same. It is not common sense to think that a mother with two young children, living in her ex-partner's flat, which ex-partner is in custody for killing his mother, are living a happy go lucky life. Mr. Nisbet wants Your Honor to consider the fact that Ms. Bridger was attempting to obtain a visa, or change her visa status, as proof that Scotland was always her and the children's home. However, he fails to rebut Ms. Bridger's explanation that she needed to do this, because she was not about to have her lawful status revoked and be at risk of deportation, leaving her children behind. Ms. Bridger credibly testified that she got herself and the children out of the country as soon as she possibly could: as soon as the borders were open, as soon as she obtained K⬛'s passport, as soon as she could get the important items packed up, and as soon as she was strong enough, having had some distance from the coercion and control which had dominated her life for years, to escape. Scotland was not these children's habitual residence. They simply had no habitual residence, until they arrived in Oregon.

The third step in the analysis is for Your Honor to determine whether the removal breached Mr. Nisbet's custody rights *under the law of the child's habitual residence*. Because Mr. Nisbet petitioned for these children to be returned to Scotland, the only law we're concerned with here is Scottish law. So first, by Mr. Nisbet's own "expert" report, under Scottish law, he does not have parental rights and responsibilities, aka custody rights, to C____. Petitioner's Exhibit 17, paragraphs 19 and 40, make this point very clear. Mr. Nisbet, yesterday, came to trial and introduced a host of documents to try to prove he has custodial rights to C____ under Jersey law. But again, we are not concerned here with Jersey law. These new documents are totally irrelevant to the case before Your Honor.

Regarding K____, to prove he has custodial rights to K____, Mr. Nisbet introduced another "expert" report. While I objected to the report being received into evidence, as it was not disclosed to me until mid-trial, not allowing me to be able to retain an expert to rebut this position, Your Honor admitted the report, indicating that you would give it the weight you think it deserves. Frankly, because of the circumstances by which it was disclosed and introduced, it doesn't deserve any weight at all. Further, while this report indicates that Mr. Nisbet had custodial rights at the time of K____'s birth, it does not indicate that he retained those rights after committing himself to a criminal sentence of an indefinite period of time after killing his mother. By Mr. Nisbet's own admission, he did not even tell this "expert" that he was in custody.

The burden is on Mr. Nisbet to prove he had custodial rights at the time of removal, and he must prove this by a preponderance of the evidence. He has not done so.

Last, in order to find that Mr. Nisbet proved his *prima facie* case, Your Honor must determine that Mr. Nisbet was actually exercising custodial rights at the time of removal. And again, Mr. Nisbet failed to prove as much. By way of exercising custody rights, Mr. Nisbet testified that he discussed schooling and vaccines with Ms. Bridger. A discussion does

not amount to exercising custodial rights. Seeing the children via Skype on a daily basis does not constitute an exercise of custodial rights. Mr. Nisbet abandoned these children when he stabbed his own mother, their grandmother, to death. And after murdering his mother, he plead guilty to a crime and accepted a sentence of an indefinite time period, away from the children. Mr. Nisbet doesn't get to now claim he was exercising custodial rights. This is yet just another way that Mr. Nisbet's desperate need for control is revealed.

Again, the burden here is on Mr. Nisbet, and he completely and utterly failed to prove his case. This petition must be denied.

Now, before getting into the affirmative defenses raised in this trial by Ms. Bridger, I want to comment on Mr. Nisbet's testimony. I ask Your Honor to find that Mr. Nisbet's entire testimony was not credible. Federal Rule of Evidence 609 indicates that a witness' character for truthfulness may be attacked by evidence of a criminal conviction. Mr. Nisbet has been convicted of one of the most heinous crimes out there. He murdered his own mother. Mr. Nisbet, throughout his testimony, hyper-focused on "diminished responsibility". Over and over again, we heard those words out of his mouth, "diminished responsibility". When I was asking him about the murder, he couldn't even admit he plead guilty. He victim-blamed and repeated over and over again, "diminished responsibility". Clearly, he doesn't think HE is responsible for his mother's death. So, not only does he have a conviction, but the way he describes and talks about this horrible incident further cuts on his credibility.

Every word that came out of Mr. Nisbet's mouth in this trial was self-serving. He couldn't admit a single piece of evidence of wrong doing or mistake, even while he sits in a locked facility after murdering his mother. Mr. Nisbet is a liar. Doing everything he possibly can to escape the law and get the control he so desperately is obsessed with retaining.

Now, by way of defenses, I want to start by discussing consent and acquiescence. Both directly and indirectly, the evidence presented to the Court proves, by a preponderance of the evidence, that Mr. Nisbet consented to the children being removed from Scotland. First, Father removed himself from the children's lives when he stabbed his mother, plead guilty to the crime, and accepted a sentence of an indefinite time period. Ms. Bridger credibly testified that she repeatedly discussed her plans to return to the United States with Mr. Nisbet. Mr. Nisbet knew she didn't have a job. He knew she didn't have any family support in Scotland. He knew she was a single mother trying to hold it together for two very young children. And knowing all of this, when Ms. Bridger brought a notary and K▮▮▮▮'s passport paperwork to Mr. Nisbet for him to sign, he willingly did so. He didn't even try to provide an explanation at trial regarding why he would have signed the paperwork but for the understanding that K▮▮▮▮ would be getting her passport and going back to the United States. And even if Your Honor finds that Mr. Nisbet didn't directly consent to the removal, there is no doubt that he acquiesced to the removal. The definition of "acquiesce" is to accept something reluctantly, but without protest. There is significant evidence before the Court of Mr. Nisbet's acquiescence. In Respondent's Exhibit 118, Mr. Nisbet writes a letter to two individuals about Ms. Bridger and the children returning to America. He appears reluctant in the letter, but he does not protest. Mr. Nisbet's own expert, Dr. McGuire, even detailed in his report in paragraph 11 (Petitioner's Exhibit 6a) that Mr. Nisbet reported to him that he has desisted from challenging Ms. Bridger's decision to come back to Oregon. Again, this is evidence of some reluctance, but it is not evidence of a protest. Additionally, in Respondent's Exhibit 110, which is another document written by Mr. Nisbet, he writes, "If she chooses to go anyway, then I live much of my life over the internet anyway, and I still have wonderful children that I can watch grow up over . . . skype…" And again, this is clear evidence of acquiescence.

The last, and most important, defense for this Court to consider is the defense of grave risk of harm. The entirety of the evidence presented to the Court in this trial proves that these children, should they be returned, are at a grave risk of psychological harm, and returning them would place the children in an utterly intolerable situation.

In analyzing this defense, Your Honor has no choice but to consider the pervasive life of domestic abuse that Mr. Nisbet forced Ms. Bridger and the children into when they were living in Scotland. Ms. Bridger emotionally testified about the coercion and control she experienced over the years of the parties' relationship. Her and the children's lives were lived according to Mr. Nisbet's terms. They lived in Mr. Nisbet's home country. He worked. She didn't. She didn't want to work menial jobs; she wanted to go to school. Mr. Nisbet wouldn't allow it. He tried to claim that schooling would be free for her, but she clarified that schooling is only free if you're a Scottish citizen. He made the money. He gave her a weekly allowance. He budgeted, and she was expected to abide by the budget. He wouldn't marry her. But he dictated what clothes she could buy and wear and what shoes she could buy and wear. He refused to buy her clothing above a size UK 8, until she was pregnant and it was a necessity. He demanded she always be waiting for him at home upon his return from work. Mr. Nisbet took part in sexual abuse, forcing sexual chores on Ms. Bridger. He refused to put her name on the car insurance so she could drive places. He pushed plastic surgeries on her, getting angry upon the news of a pregnancy because it interfered with breast implant surgery. He bought her a Cognitive Behavioral Therapy book, demanding she teach herself how to think more positively of him. He demanded she throw away old journals with negative thoughts in them, and start a new journal only writing about happy things with him. He made non-genuine suicide attempts in an effort to manipulate and control. He wasn't there for the birth of either child. Even after becoming incarcerated, he continued with the coercion and control, demanding phone calls every day, sometimes up to 6 or 7 hours long.

Even then, he requested Ms. Bridger have a drink before their calls so she could be happier when they spoke. Mr. Nisbet is **exactly** the type of individual described in the Domestic Homicide Review in evidence that Mr. Nisbet so vehemently objected to.

At trial, Dr. Poppleton testified at length regarding risk factors for domestic violence, and he also wrote about them in his letter to the Court, Respondent's Exhibit 131. These risk factors include problems in inter-personal relationships, problems with authority, impulsivity, anger, deviations in thoughts and behaviors, and homicidal and suicidal ideations. Other risk factors include whether an individual has a history of trauma and/or victimization, history of mental illness, exhibits minimization and denial of responsibility for things, and has poor insight or self-awareness.

Mr. Nisbet checks all of these boxes. Per his own records, he is documented as being cold and callous, being unable to engage in reciprocal interaction, refusing to work with certain staff, having deficits in emotional self-control, being irresponsible, unable to maintain friendships, having a low tolerance to frustration, prone to blame others for what he has done, being cognitively inflexible, having a lack of empathy, and having rigid fixations. We heard testimony about Mr. Nisbet recently threatening staff, and Ms. Bridger described incidents where Mr. Nisbet was even injured in physical altercations with staff. Additionally, Mr. Nisbet is described in his records as grandiose and unrealistic. He's documented to have refused treatment, both when he first arrived at the hospital and now (though Mr. Nisbet claims he has never refused treatment). In sum, his records describe him as being very rude, condescending, self-centered, and abusive toward staff.

It is curious that Mr. Nisbet did not have a single of his care providers testify for him in this trial. No psychiatrist. No psychologist. No social worker. No nurse. Mr. Nisbet relies heavily on Dr. McGuire's testimony. However, Dr. McGuire's testimony should not be given any weight by this Court. Dr. McGuire interviewed Mr. Nisbet on a single occasion,

and he appears to have discounted years of psychological records documenting Mr. Nisbet's struggles, records which Ms. Bridger was not provided. Furthermore, Dr. McGuire was hired to assess whether or not Mr. Nisbet has a personality disorder. But as Dr. Poppleton explained, whether or not Mr. Nisbet has a personality disorder doesn't matter. The personality features described above are just that—personality features that make Mr. Nisbet who he is. And they are personality features that increase the risk of domestic violence.

As Dr. Poppleton explained, both the history of domestic violence as credibly reported by Ms. Bridger and the risk factors evidenced in Mr. Nisbet's psychological records put forth significant concern for the children involved in this matter. Domestic violence matters so much because it decreases an individual's ability to parent, and in doing so, is a detriment to children and their healthy development. Dr. Poppleton writes in his report, "Children living in an atmosphere of fear, unpredictability, not having their own developmental needs met, and of being hypervigilant for signs of tension, raised voices, and escalation are at significant risk." And while it is clear that Dr. Nisbet is a serial spousal abuser, Your Honor should consider Dr. Poppleton's testimony and the literature and science indicating that this particular type of domestic abuse, coercion and control, is also a significant risk factor for child abuse in the future.

By way of grave risk, I also ask Your Honor to consider the exact situation that you would be returning these children to, and also removing them from. The children are incredibly well settled here in Oregon, and Ms. Bridger, Gregory Bridger, Jeffrey Bridger, Evelyn Downing, Dennis Murray, Morgen Sanborn, and Rebecca Sirstad all credibly testified as much. The children are set up within the social security system here. They are in school, and loving it. They have play dates and go to birthday parties. They have health insurance. They have a pediatrician. They have a dentist. They have a substantial support network of both family and friends. They have pet bunnies. They have a grandmother who isn't dead.

And, they have their most favorite person in the whole entire world to love and care for them, their mother, Ms. Bridger.

Mr. Nisbet requests that the children be ripped away from the only parent they've ever known. He requests that they be placed with his friend, Paul Harper, who actually seemed to testify against Mr. Nisbet. Mr. Harper indicated that (1) he doesn't really know the children, (2) he's willing to look after the children for a "short period of time until other accommodations can be made", and (3) he lives an hour and a half from the hospital that Mr. Nisbet is housed in, and he would likely take the children to see Mr. Nisbet only every three to four weeks. Mr. Harper further testified that, in his experience as a psychologist, the children would likely experience extreme distress, sadness, and anxiousness. Put another way, this is psychological harm. When Mr. Harper is no longer able to care for the children, Mr. Nisbet proposes that he would hire a full-time nanny to live with the children. He seems to claim that placing the children with a total and complete stranger would be rational and safe. I'm not sure what world Mr. Nisbet is living in, but it sure isn't one that the Hague Convention requires the children be returned to.

Mr. Nisbet wants Your Honor to believe that he will be released in the very near future, but his claim in this regard just doesn't make any sense. David Steenson testified about the specifics of the criminal law system in Jersey, and he told Your Honor that, despite Mr. Nisbet claiming that it's up to the tribunal whether or not to release him, the Jersey courts retain jurisdiction, and there must be a hearing before Mr. Nisbet may be released into the community. While there was some confusion regarding which country retains jurisdiction of Mr. Nisbet's case, Advocate Steenson also explained that which country is responsible for him doesn't really matter. Both Jersey and England follow the same process when it comes to Mr. Nisbet being released. There are restrictions in place. Before those restrictions are lifted, the matter must go back to the courts.

The fact of the matter is, Mr. Nisbet remains locked up. That, in and of itself, is evidence that he is not safe to be released. He is not safe to be in the community. He is not safe to be a parent and raise young children. Further, Mr. Nisbet told us that he's currently allowed to go out into the community and have a beer. Ms. Bridger then told us that Mr. Nisbet frequently commented to her how easily it would be to abscond from the hospital. Taking these two facts together, and considering them in the realm of the history of and risk for domestic violence, we're looking at a recipe for disaster.

And even without this, there was no testimony whatsoever regarding the equivalent of Child Protective Services in Scotland. Should these children be returned, would a child protective services agency step in? Would Mr. Nisbet, having killed his own mother, even be allowed to live with and care for these children in the future?

Mr. Nisbet's request that the children be taken from their familiar and loving environment and put into the situation described above, is, by definition, an intolerable situation. As Dr. Poppleton testified, it really "shocks the conscience."

In Respondent's Exhibit 112, a document that Mr. Nisbet wrote to coach Ms. Bridger on how to answer questions asked of her, he instructs her to say, "I am really furious that people keep writing that Andrew is in some way controlling or coercing me. . ." This sentence, within this document, all on its own, sums up Mr. Nisbet: an incredibly controlling and abusive individual. Mr. Nisbet's psychological records submitted to this Court indicate that Mr. Nisbet frequently exhibits parallels between the time surrounding the murder and time throughout the past couple of years. This time, this case, is no different. When Mr. Nisbet experienced rejection from his parents, he murdered his mother. Now, he is experiencing rejection from C﹎'s and K﹎'s mother. Should these children be returned, there is no telling what he may do.

To briefly comment on Mr. Nisbet's closing argument, I'd like Your Honor to consider a few points:

1. Mr. Nisbet is using the fact that he filed this Hague case and proceeded with the litigation as evidence that he did not consent to the children being removed from Scotland. I would ask Your Honor to consider that Mr. Nisbet may be using this Hague case as a further means to control Ms. Bridger—to financially drain her and try to force her back to Scotland, where he would be able to continue with the ongoing abuse.

2. Mr. Nisbet asks the Court to not consider the fact that he killed his mother. That he has shown remorse. However, Mr. Nisbet exhibited quite the opposite in this trial. When discussing the killing, he focused on the fact that his mother never treated him well, and he had diminished responsibility. Furthermore, in his records, we can see that he puts forth the excuse that, in a black out state, he pulled out a knife that had been left open in his pocket. People don't leave open knives in their pockets and just go about their days. This is a single and drastically important fact, because if the knife was not open, Mr. Nisbet would have had to take the knife out of his pocket, deliberately open it, and force it into his mother's neck. This takes away the diminished capacity aspect of Mr. Nisbet's crime, and it creates even more concern regarding his capacity for crime, violence, and the return of these children.

3. Mr. Nisbet, at the end of his closing, directs Your Honor to two "precedents".
    a. The case "In the Matter of L.L." is not authority this Court must follow. It is a case out of New York, decided in 2000. The court there relied heavily on *Blondin*, which has since been overturned.

      b.      I was unable to find a copy of the Swiss case relied upon in English. I did, however, stumble across the following link, where it appears Mr. Nisbet and/or his counsel copied and pasted information from that website into their closing argument: https://www.international-divorce.com/switzerland_and_child_abduction.

Finally, I ask Your Honor to seriously take into consideration Mr. Nisbet's own actions and mannerisms throughout this trial. He proved he has no impulse control. And, at the same time, he proved he needs to be in control. Think about Mr. Nisbet's mannerisms when his attorney was not asking the questions Mr. Nisbet wanted him to ask. Think about Mr. Nisbet's mannerisms when Paul Harper was testifying that the children may be at risk of psychological harm if they're returned. Then think about Mr. Nisbet's mannerisms when he was in control, when he was the one asking the questions of Dr. Poppleton.

Based on all of this, I respectfully ask Your Honor to deny the Petition. Bringing this matter before the Court was frivolous, and Ms. Bridger will follow with a petition for her attorney fees incurred in this matter.

Respectfully submitted this 19th day of October, 2023.

 

_____
Katrina Seipel, OSB #164793
Of Attorneys for Respondent

CERTIFICATE OF SERVICE

I certify that this document was served by electronic service through the CM/ECF filing system and by e-mail upon Bradley Lechman-Su, at bradley@bradleylechmansu.com, on this 19th day of October, 2023.

_____
Katrina Seipel, OSB #164793
Of Attorneys for Respondent
kas@buckley-law.com