IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ANDREW CHARLES NISBET**, | Case No. 3:23-cv-00850-IM |
| Petitioner, | |
| | **OPINION AND ORDER DENYING THE PETITION FOR RETURN OF CHILDREN UNDER THE HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION** |
| v. | |
| **SPIRIT ROSE BRIDGER**, | |
| Respondent. | |

Bradley C. Lechman-Su, 1000 SW Broadway St., Suite 2300, Portland, OR 97205. Attorney for Petitioner.

Katelyn D. Skinner and Katrina Seipel, Buckley Law, P.C., 5300 Meadows Road, Suite 200, Lake Oswego, OR 97035. Attorneys for Respondent.

**IMMERGUT, District Judge.**

This matter arises out of an international dispute over two children, five-year-old ACN and three-year-old KRN. In June 2022, the children and their mother, Respondent Spirit Rose Bridger, left Scotland for the United States, and have lived in Oregon ever since. The children's father, Petitioner Andrew Nisbet, argues that Respondent took their children in violation of the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"). The

PAGE 1 – OPINION AND ORDER DENYING PETITION FOR RETURN

Convention mandates that a child wrongfully removed from her country of "habitual residence" must be returned to that country unless a return poses a grave risk of harm to the child or otherwise places the child in an intolerable situation. Invoking the Convention, Petitioner has filed a petition requesting that the children be returned to Scotland. Petition for Return, ECF 1.

This Court held a three-day expedited court trial in this matter beginning on October 16, 2023. ECF 39. Based on the evidence presented through witnesses and exhibits, and considering the arguments presented in the pleadings and written closing arguments, this Court DENIES the Petition for Return.

The evidence compels two conclusions. First, Petitioner has failed to prove by a preponderance of the evidence that the children's habitual residence was Scotland. The evidence shows that the children did not have a settled permanent home in Scotland before arriving in the United States. They were unsettled largely because Petitioner killed his mother in August 2019 and then was detained and committed to a secure psychiatric facility in England. Indeed, one of the children was not yet born at the time of those events. Second, even assuming the children's habitual residence was Scotland before they moved to Oregon, the Convention does not require a return of the children because Respondent has shown by clear and convincing evidence that a return to Scotland would present a grave risk of harm or otherwise place the children in an intolerable situation. The children have no familial support network there. Their father, Petitioner, remains indefinitely committed to a secure in-patient psychiatric health facility. And Petitioner has a history of violent and coercive behaviors that constitute major risk factors for domestic abuse.

## PROCEDURAL BACKGROUND

On June 12, 2023, Petitioner filed his Hague Convention petition requesting that his children be returned to Scotland, which he asserts is their habitual residence. Petition for Return,

PAGE 2 – OPINION AND ORDER DENYING PETITION FOR RETURN

ECF 1. The Petition was served on August 9, 2023. ECF 9. Respondent entered appearance on

August 23, 2023. ECF 8. Six days later, Respondent filed her response, ECF 10, and on

September 5, she requested that an expedited trial be held the next week, citing the Hague

Convention's aspiration for every petition to be resolved within six weeks, ECF 11 at 1–2. *See*

*Chafin v. Chafin*, 568 U.S. 165, 179–80 (2013) (urging district courts to expedite Convention

cases); *Holder v. Holder*, 392 F.3d 1009, 1023 (9th Cir. 2004) (same). On September 13, 2023,

this Court held a telephonic status conference to set an expedited case management schedule and

a two-and-a-half-day trial for October 16–18, 2023. ECF 13. Both Parties agreed to this

schedule, which was proposed by Petitioner in writing. This Court presided over a trial on those

dates.[1] ECF 35, 38, 39.

## FINDINGS OF FACT

This Court makes the findings of fact below based on the exhibits submitted and the

testimony presented at trial. Both Parties agreed to substantially relax the rules of evidence, and

this Court accepted all exhibits that were submitted or read into evidence. *See Farr v. Kendrick*,

No. CV-19-08127-PCT-DWL, 2019 WL 2568843, at *2 (D. Ariz. June 21, 2019) ("Rule

1101(d)(3) of the Federal Rules of Evidence provides that the Rules of Evidence 'do not apply'

to 'miscellaneous proceedings such as . . . extradition and rendition,' and [a Hague Convention]

proceeding is—in the Court's view—similar to an extradition proceeding."), *aff'd*, 824 F. App'x

480 (9th Cir. 2020). Like the *Farr* Court, this Court concluded that the most expeditious

procedure, particularly given Petitioner's confinement abroad, would be "to apply a relaxed

---

[1] During trial, this Court at times permitted Petitioner to interject, to confer with his
attorney over the courtroom's videocall system, and to ask witnesses questions because
Petitioner is abroad in a secure facility and seemingly had greater access to documents.

admissibility standard during the hearing and then discount the evidentiary value of any dubious evidence during the fact-finding process." *Id.*[2]

## A. Events Preceding Petitioner Killing His Mother

### 1. Beginning of Petitioner and Respondent's Relationship

Petitioner and Respondent met in 2012 through a video game that they both played. Ex. 108A ¶ 4.3; Ex 108B at 11, ¶ 37. They first met in person in New York City, and after Petitioner completed his medical studies in 2013, they traveled together to New Zealand. Ex. 108A ¶ 4.3; Ex. 108B at 11, ¶ 37. Following the trip to New Zealand, Petitioner and Respondent moved to Edinburgh, Scotland in 2015.

Respondent Bridger presented testimony, which this Court found credible, about her relationship with Petitioner. Respondent testified that as the relationship developed, Petitioner exerted increasing control over Respondent. Respondent had no say in where they would live. Petitioner strictly budgeted Respondent's spending, and Respondent needed to seek approval if she sought to make purchases above ten British pounds. He refused to let her buy clothes above a certain size. He would give her extra money if she performed "sexual chores," such as using certain sex toys on herself that she would not have used otherwise. He wanted her to get multiple plastic surgeries, which she did not want. Petitioner expected that Respondent be there to greet him when he got home every day; he would not accept any excuse, even that she was out to buy groceries. Respondent wished to finish her college degree, but Petitioner would not support this

---

[2] Because of the expedited nature of this case, this Court's opinion cites exhibits but not a trial transcript because an official transcript would not have been available within an expeditious timeline. Even so, the findings here reflect this Court's consideration of *all* evidence including exhibits and trial testimony and this Court's credibility determinations.

unless it was a degree he approved. Because she was afraid of the consequences of noncompliance, Respondent rarely disobeyed Petitioner's directions.

### 2.   Moving to Jersey and the Deterioration of Petitioner's Mental State

In the Spring of 2017, Respondent became pregnant with their son, ACN, in Scotland. Ex. 108A ¶ 4.8. Around this time, Petitioner's lifelong attachment to his parents' home on the Island of Jersey, a small country outside the U.K., grew into an obsession. *Id.* ¶¶ 4.8, 5.3.5–5.3.6.

In the Summer of 2017, Petitioner's parents informed him that they wished to sell their home in Jersey. *Id.* ¶ 4.9. Petitioner did not take this news well. He offered to put money into the property so that he, Respondent, their coming son, and his parents could live together as a family. *Id.* His parents refused.

This refusal led to Petitioner's first suicide attempt. In November 2017, when Petitioner and Respondent still resided in Scotland, Petitioner tried to commit suicide by injecting air into his veins to cause an embolism. Ex. 108B at 13, ¶ 43; Ex. 108A ¶ 5.4.1. This attempt failed. The same month, following the suicide attempt, Petitioner and Respondent arrived unannounced at his parents' home in Jersey, intending to move in. 108A ¶¶ 5.3.8, 5.4.2. Petitioner's parents reluctantly allowed Petitioner and Respondent to stay in the annex to the house, *id.*; Ex. 108B at 64, ¶ 106—a small one bedroom apartment with a kitchenette. After a couple of months, Petitioner's parents asked Petitioner and Respondent to leave. Ex. 108A ¶¶ 5.3.8, 5.4.2.

In response, Petitioner again attempted suicide. In January 2018, at his parents' home in Jersey, Petitioner threw himself out of a window twenty feet above the ground. Ex. 108B at 13–14, ¶¶ 43–44; *id.* at 52, ¶ 33; Ex. 108A ¶¶ 5.3.8, 5.4.3. Petitioner severely fractured his feet and his spine. He was bedridden for nine-and-a-half months. Ex. 108B at 14, ¶ 45. Petitioner has reported at times that he felt no choice but to jump. Ex. 108A ¶ 5.4.4; Ex. 108B at 13–14, ¶ 44.

On other occasions, he has said that his suicide attempts were not serious attempts and were a method to have people follow his demands.[3] Ex. 114 ¶ 9.7; *see also* Ex. 108B at 71, ¶ 150.

At the time of the second suicide attempt, Respondent was eight months pregnant, and her caesarean section had been scheduled to occur in two weeks. Respondent gave birth to ACN on February 1, 2018 in Jersey. *See* Ex. 2d. Petitioner was not present. For the first eight months of ACN's life, Respondent cared for ACN with little involvement from Petitioner due to his injuries. And because Petitioner was bedridden and refused to put Respondent on car insurance, Respondent could not drive, further hampering her ability to take care of herself and her child.

Respondent moved back to Scotland with ACN—without Petitioner—in August 2018. Six months later, she returned to Jersey, to the home of Petitioner's parents, after Petitioner assured her that the family issues had been resolved.

From February to August 2019 the situation in Jersey deteriorated further. During these months, the police and psychiatric services were called on multiple occasions to the home in Jersey. Petitioner's parents continually refused to accept Petitioner and Respondent's family there. In response, Petitioner would become extremely upset, frustrated, and angry and would express those feelings through acts of violence. Ex. 108A ¶ 5.2.5. It is unrefuted that Petitioner would often smash his head into a wall or banister, sometimes several times a day. *See, e.g.*, *id.* He broke a plastic table by smashing it with his hands. *Id.* Petitioner would throw furniture around. Ex. 114 ¶¶ 10.6–10.14. Various responders noted Petitioner's suicide threats, explosive

---

[3] Petitioner contests the relevance and reliability of Ex. 114, a Domestic Homicide Review conducted by an independent investigator appointed by the Jersey Government. Petitioner's protests are unpersuasive. The document's sources are Jersey Government agencies, Ex. 114 ¶¶ 4.7–4.8, and the investigation was conducted according to guidelines established by the United Kingdom Home Office, *id.* at 5. The Review's purpose was to understand the circumstances leading to the death of Petitioner's mother. This Court thus views the Review's fact-finding as reliable, though this Court does not rely on its conclusions or opinions.

behavior, refusals of treatment, and unceasing belief that his parents, not he, needed to change

their stance concerning the house in Jersey.[4] *Id.* ¶¶ 9.17–9.21; Ex. 108B at 25–30, ¶ 88.

Petitioner's father told responders that Petitioner consistently tried to manipulate him. Ex. 108B

at 20, ¶ 67. Petitioner's brother described Petitioner as controlling in his relationships, *id.* at 22,

¶ 77, and he denied Petitioner any contact with the brother's children, Ex. 108A ¶ 5.2.6.

Petitioner pulled his mother's hair and would harass his parents for hours at a time. *See, e.g.*, Ex.

114 ¶ 9.17. Petitioner sometimes cornered his father and Respondent. Petitioner would demand

to know everything occurring in Respondent's life and would instruct her to seek his permission

to do anything. In that vein, Petitioner told Respondent not to inform anyone else in her life

about the situation in Jersey. He told her to get rid of her daily journals because they cast him in

a bad light.

  During this period, in the Summer of 2019, Respondent became pregnant with her second

child, KRN.[5] Respondent packed her bags to prepare for a move back to Oregon with ACN and

discussed a potential move with Petitioner several times. *See, e.g.*, Ex. 108B at 57, ¶ 66

(Petitioner writing in March 2019 that Respondent might leave for the United States); *id.* at 58,

¶ 76 (same observation in April 2019); *id.* at 65, ¶ 118 (Petitioner observing in July 2019 that

Respondent would likely be deported from Jersey).

---

  [4] A psychiatric report from May 5, 2020, commissioned by the Attorney General of
Jersey, corroborates these reports with considerable first-hand quotes from various sources,
particularly medical reporters, who interacted with Petitioner in the events leading up to the
killing. *See* Ex. 108B at 50–72, ¶¶ 25–159.

  [5] There is no dispute that Petitioner is KRN's biological father.

PAGE 7 – OPINION AND ORDER DENYING PETITION FOR RETURN

Petitioner's parents issued a notice of eviction to the Parties on August 2, 2019. Ex. 108A ¶ 9.4. Petitioner threatened to commit suicide if his parents followed through with the eviction. Ex. 108B at 71, ¶ 154.

### 3.  Petitioner Kills His Mother

On August 6, 2019, Petitioner approached his mother in the kitchen to dissuade her from evicting him and his family. Respondent and infant ACN were present for the beginning of the encounter, but they departed the room because the argument between Petitioner and his mother grew more rancorous. Ex. 108B at 16–17, ¶ 53. Minutes later, Petitioner, who had a Leatherman pocketknife in his pocket, stabbed his mother in the neck. *Id.* at 17, ¶¶ 54–55; Ex. 108A ¶¶ 9.5, 9.8. He says he cannot remember the act.

Petitioner was soon arrested. A pregnant Respondent and eighteen-month-old ACN were taken to a refuge in Jersey. Petitioner's family severed all contact with the Parties and ACN.

## B.  Events After Petitioner's Arrest

After his arrest, Petitioner pleaded guilty to manslaughter on the basis of diminished responsibility. Ex. 102 at 2 (Judgment of Jersey Royal Court). Petitioner was ordered to serve an indefinite term in a secure psychiatric facility. *Id.* at 4, ¶¶ 2–3. The Royal Court likewise ordered that a medical examiner provide a report every nine months on Petitioner's health and progress. *Id.* The Royal Court issued a restraining order that, among other things, bars Petitioner from contacting his father, brother, or his brother's family. *Id.* at 4, ¶ 4(i)–(viii).

After two weeks in the Jersey refuge, Respondent and ACN moved to a halfway house in Jersey. During their stays at the refuge and halfway house, Respondent contemplated moving back to Oregon, but she decided against doing so because she was  pregnant and lacked health insurance in the United States. *See* Ex. 118 at 1 (Petitioner writing that Respondent was seriously

considering a move back to the United States in Fall 2019). In late 2019, Respondent and ACN moved back to Scotland for her to give birth.

On February 27, 2020, KRN was born. Ex. 2e. At that time, the COVID-19 pandemic had begun and borders between countries were closing to contain the disease. Before Respondent could make an appointment at the United States Consulate in Edinburgh to apply for KRN's Passport and Consular Report of Birth Abroad, the Consulate closed.

Respondent maintained a civil relationship with Petitioner. She did so because she knew that she would need Petitioner's signature to obtain KRN's paperwork. She also needed funds as she was unemployed. *See* Ex. 124 (email exchange showing that Respondent asked for needed funds and that Petitioner responded with a budget he set). And her U.K. visa was expiring.[6] *See* Exs. 20–22. She had to call him five or six times a day, spending an hour per call. Petitioner told Respondent to drink alcohol before their calls so that she would be "happy." Petitioner ghostwrote letters to tribunals and medical care providers as if they had been written by Respondent and had Respondent send those letters. *See* Exs. 121–22. He gave her scripts to follow when calling individuals on his behalf. *See* Exs. 112, 123. He forced Respondent to provide him with a PDF of her signature so that he could sign letters under her name. If she ever refused to engage or pushed back, Petitioner would get angry and harass Respondent. In one instance, after Respondent did not respond to a call from Petitioner, he repeatedly called and messaged Respondent, demanding to know where she was. When she did not respond, he threatened to call the police to break her door down—with no regard for the safety of the children. Following this threat, Respondent complied with Petitioner's demands and called him

---

[6] The uncertainty over KRN's paperwork and the visa meant that Respondent explored the possibility of permanent residence in Scotland to stay with her children.

back. Petitioner made similar threats several times, such that Respondent discretely sought help from a member of her weekly knitting club.[7]

The children lived in Petitioner's apartment in Scotland. Although they attended nursery in Scotland, they did not have any friends or family there. Petitioner communicated with the children over Skype from the psychiatric facility every day for an hour. Petitioner read stories and played games with them, but often, after a short period, the children stopped paying attention to Petitioner on the screen. Petitioner would get upset and demand that Respondent direct the children back to the screen.

After the killing, Petitioner saw ACN four times and KRN three times. Respondent and ACN first visited Petitioner in person in November 2019. Respondent visited Petitioner with both children in June, July, and December 2021. At the December 2021 visit, Petitioner signed the paperwork Respondent needed to acquire KRN's U.S. passport and Consular Report of Birth Abroad. It is unrefuted that Respondent told Petitioner that she intended to move to the United States once KRN had her passport—a possibility Petitioner acknowledged, *see* Ex. 110 ¶ 3(c). In 2022, Petitioner appealed to a tribunal for his release. Respondent expressed great anxiety to Rayya Ghul over Petitioner's potential release. The appeal was ultimately denied.

On June 17, 2022, Respondent departed Scotland for the United States with ACN and KRN. In the months before departing Scotland, Respondent sent several boxes of her and her children's possessions to her current home in Portland, Oregon.

---

[7] This individual, Rayya Ghul, testified at trial and corroborated Respondent's testimony. She is a therapist with decades of experience, and Respondent confided in her for that reason.

## C.  Events Since the Children's Arrival in the United States

The children have resided in Oregon for 15 months at the time of this Opinion's issuance. The children are U.S. citizens; ACN also has a Jersey passport, and KRN a Scottish passport. The children have Social Security Numbers. Ex. 106 (ACN letter); Ex. 107 (KRN letter). They both have health insurance. Ex. 105. They have a wide network of friends and family including Respondent's two brothers, mother, and stepfather, as well as close friends to Respondent and her family—all of whom testified. There has been minimal contact between Respondent and Petitioner since the removal. In Oregon, the children have never mentioned their father—who has never lived in the same home as KRN and lived for a total of a year, on and off, with ACN.

## D.  Petitioner's Indefinite Confinement

Petitioner has been sentenced to an indefinite period of psychiatric confinement. After the killing, he was first held at Brockfield House. Ex. 102 at 2; Ex. 127 at 2. In April 2021, Petitioner was transferred to a facility called St. Andrew's. Ex. 127 at 2. There, Petitioner may roam the grounds unescorted. *Id.* Petitioner was not discharged after a request for release was heard in September 2023.[8] Both Brockfield House and St. Andrew's are in England; Petitioner has not lived in Scotland since 2017.

At St. Andrew's, Petitioner has continued to display behaviors like those he showed in Jersey. On May 18, 2023, a month before filing his Hague Petition, Petitioner  threatened to attack staff when he was moved between wards. Petitioner has refused treatment recommended by St. Andrew's, insisting that he receive therapy from his personal therapist, Jane Pointon,

---

[8] Petitioner provided no documents on the tribunal hearing despite several requests by Respondent and orders by this Court. Petitioner insists that this is because of U.K. laws requiring permission to provide documents. But Petitioner launched this suit in June—he had an independent obligation to begin seeking permission in advance of the trial he sought.

whom he has seen since 2017. Petitioner has also decided that mindfulness methods, not intensive therapy, suffice as treatment. *See* Ex. 31 at 2. This is so despite the fact that even Petitioner's own expert did not see any document recommending Petitioner go without therapeutic treatment. Finally, in confinement, Petitioner has apparently at times barricaded himself from hospital staff, punched walls, banged his head against a window, and had physical altercations with the staff. *See, e.g.*, Ex. 120 at 1.

## CONCLUSIONS OF LAW

### A. General Framework of the Convention

In 1980, the Hague Convention was adopted "to address the problem of international child abductions during domestic disputes." *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020) (brackets and citation omitted). Both the United States and the United Kingdom are signatories. *Chafin*, 568 U.S. at 170. The United States has ratified the treaty and enacted implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011. Under ICARA, federal courts have jurisdiction over Convention petitions and must decide cases "in accordance with the Convention." *Id.* § 9003(a), (d).

The Convention "seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State.'" *Chafin*, 568 U.S. at 168 (quoting Hague Convention, art. 1, 19 I.L.M. at 1501). To that end, Article 3 provides that the removal of a child is wrongful when it breaches a person's rights of custody "under the law of the State in which the child was habitually resident immediately before the removal." Hague Convention, art. 3, 19 I.L.M. at 1501. When a child's removal violates Article 3, "the judicial . . . authority of the Contracting State where the child is . . . shall order the return of the child." Art. 12, *id.* at 1502. But a court need not order a child's return to her habitual residence if "there is a grave risk that [the child's]

return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13(b), *id.*

### B. Petitioner Has Failed to Establish that the Children Were Habitually Resident in Scotland

Petitioner must show by a preponderance of the evidence that the children's habitual residence on June 17, 2022 was Scotland. 22 U.S.C. § 9003(e). "[A] child's habitual residence," the Supreme Court has instructed, "depends on the specific circumstances of the particular case." *Monasky*, 140 S. Ct. at 727. "No single fact . . . is dispositive across all cases." *Id.* Highly relevant are "facts indicating that the parents have made their home in a particular place," *id.* at 729, and the "child's conduct and experiences," which must show that the child was "'firmly rooted' in her . . . surroundings, not merely . . . acculturated to a country's language or customs." *Karkkainnen v. Kovalchuk*, 445 F.3d 280, 292 (3d Cir. 2006) (quoting *Holder*, 392 F.3d at 1019). At bottom, "this factual inquiry is guided by common sense." *Kenny v. Davis*, No. 21-35417, 2022 WL 501625, at *1 (9th Cir. Feb. 18, 2022).

This Court agrees with Respondent that Petitioner has failed to meet his burden. Rather, the preponderance of the evidence compels the conclusion that, on June 17, 2022, ACN and KRN lacked a habitual residence altogether.

ACN was born in Jersey in February 2018, only a month after Petitioner had thrown himself out a window and suffered serious foot and spinal injuries. Soon after, ACN left for Scotland with his mother, who was trying to escape the discord in the Jersey home wrought by Petitioner's behavior. *See Douglas v. Douglas*, No. 21-1335, 2021 WL 4286555, at *6 (6th Cir. Sept. 21, 2021) (Sutton, C.J., White & McKeague, J.J.) (reasoning that a child's stay in a place was "merely transitory" when he consistently moved between "temporary housing"). Because Petitioner was bedridden for most of ACN's early life, Petitioner only raised ACN in earnest for

the six months between February and August 2019. During those months, moreover, Respondent repeatedly contemplated moving back to Oregon because of the situation in Jersey, and Petitioner knew this.

KRN was born in February 2020. When she was born, Petitioner was in custody, and Respondent and ACN had been shuttled through Jersey shelters before finding housing in Scotland. Even before Respondent had given birth to KRN, she had contemplated moving back to Oregon, but decided against it because she lacked health insurance in the United States. She told Petitioner multiple times that she intended to leave Scotland with the children, and he signed KRN's passport paperwork. *See Monasky*, 140 S. Ct. at 727 (explaining that "intentions and circumstances of *caregiving* parents are relevant considerations" (emphasis added)).

The children had no family or friends in Scotland and no meaningful relationship with their father. Petitioner has never lived with KRN and met her in person only three times. Petitioner lived with ACN for a total of a year, on and off, and for a substantial amount of that time, he was bedridden from his second suicide attempt. And Respondent was in the U.K. on an expiring visa. *See Kijowska v. Haines*, 463 F.3d 583, 587–88 (7th Cir. 2006) (Posner, J.) (placing great weight on the mother's immigration status and the fact that the child had been raised solely by the mother). Petitioner himself has not lived in Scotland for several years.

It follows from the children's lack of connection to Scotland and Respondent's clear intent (which Petitioner understood) that the children's habitual residence was not Scotland. As the Ninth Circuit has explained:

> When a child is born under a cloud of disagreement between parents over the child's habitual residence, and a child remains of a tender age in which contacts outside the immediate home cannot practically develop into deep-rooted ties, a child remains without a habitual residence because "if an attachment to a State does not exist, it should hardly be invented."

PAGE 14 – OPINION AND ORDER DENYING PETITION FOR RETURN

*In re A.L.C.*, 607 F. App'x 658, 662 (9th Cir. 2015) (quoting *Holder*, 392 F.3d at 1020) (holding that a child born in the United States was not habitually resident there because she was too young to form roots and the parents disagreed about where to settle down). Or as the Third Circuit has explained, "where [parental] conflict is contemporaneous with the birth of the child, no habitual residence may ever come into existence." *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003) (Alito, McKee & Schwarzer, J.J.) (holding that a child's habitual residence could not be Belgium even though the child was born there because the child had no clear roots in Belgium and the mother did not intend to live there). This reasoning resolves this case in Respondent's favor.

Moreover, evidence of Petitioner's coercive behavior also supports this outcome. Petitioner levied many demands on Respondent in exchange for his signature and money— including daily hours-long phone calls—and he threatened her, in ways that could also harm the children, when she did not meet his demands. *See Monasky*, 140 S. Ct. at 727 (explaining that whether a "caregiving parent had been coerced into remaining" in a country is a relevant factor). On the evidence, Petitioner used his children as leverage to force Respondent to stay.

In sum, the facts here amply prove that the children lacked meaningful connection to Scotland, that their caregiving parent had long intended to move to Oregon, and that their absentee parent had coerced their caregiver into remaining longer than she wished. The children did not have a habitual residence on June 17, 2022; this Court therefore denies the Petition.[9]

---

[9] This Court thus need not decide whether Petitioner had custodial rights over his children at the time of removal, whether he exercised those rights, or whether he consented to the children's removal.

PAGE 15 – OPINION AND ORDER DENYING PETITION FOR RETURN

**C. Respondent Has Proven by Clear and Convincing Evidence that Returning the Children to Scotland Poses a Grave Risk of Harm and Intolerable Situation to the Children**

Even assuming the children's habitual residence was Scotland at the time of removal, this Court also denies the Petition because Respondent has proven by clear and convincing evidence that the children face a grave risk of harm or an intolerable situation if returned to Scotland. *See* 22 U.S.C. § 9003(e)(2). Under Article 13(b)'s grave risk inquiry, "the question is whether the child [if returned] would suffer serious abuse that is a great deal more than minimal." *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) (quotation marks and citations omitted), *abrogated on other grounds by Golan v. Saada*, 142 S. Ct. 1880 (2022). On the grave risk inquiry, Respondent presented the testimony of Dr. Landon Poppleton, who discussed the risk factors for domestic violence. Petitioner presented the testimony of Dr. James McGuire, who considered whether Petitioner has a personality disorder.

The facts here compellingly show that a return to Scotland poses ACN and KRN a grave risk of harm and intolerable situation. Because sending the children alone to Scotland while Petitioner is confined is facially an intolerable situation, *see Neumann v. Neumann*, 310 F. Supp. 3d 823, 828–30 (E.D. Mich. 2018), this Court considers the probable circumstances if Petitioner is released in the future.

Petitioner has an extended record of violence that meets the major risk factors for domestic violence. Domestic violence is crucially relevant to the grave risk defense. As the Ninth Circuit has recounted, "[t]he case law reflects that 'domestic violence is a common inciter to "abduction"—the abused spouse flees and takes her children with her.'" *Colchester v. Lazaro*, 16 F.4th 712, 717 (9th Cir. 2021) (quoting *Khan v. Fatima*, 680 F.3d 781, 784 (7th Cir. 2012)). "Th[e] 'grave risk' defense thus reflects the proposition that 'the remedy of return . . . is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the

PAGE 16 – OPINION AND ORDER DENYING PETITION FOR RETURN

children from the other parent's violence." *Id.* (quoting *Khan*, 680 F.3d at 784); *see Morales v. Sarmiento*, Civil Action No. 4:23-CV-00281, 2023 WL 3886075, at *11–13 (S.D. Tex. June 8, 2023) (Ellison, J.) (gathering cases). So courts may consider evidence of a parent's history of abuse, or threats of abuse, to determine the probability and magnitude of risk to the child. *See, e.g.*, *Gomez v. Fuenmayor*, 12 F.3d 1005, 1012–14 (11th Cir. 2016) (gathering cases and considering petitioning parent's prior violent acts toward others).

Dr. Poppleton identified several risk factors for domestic violence. These include the history of how one has handled conflict; instances of violence; financial control; attempts at isolating a romantic partner; gender-based control; suicidal ideation; denying a romantic partner's perception of reality; and negative attitudes toward authority. Dr. Poppleton also emphasized that a risk assessment must focus on who an individual is "behind closed doors." *Cf. Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) ("Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected.").

All risk factors are present here. Petitioner has attempted suicide twice, once by throwing himself out a window. He routinely threatened suicide when his parents did not give him what he wanted. He destroyed furniture, screamed, pulled his mother's hair, and cornered people. He routinely smashed his head against walls in front of others. He killed his mother because she would not comply with his demands. While in confinement, he forced Respondent to call him for many hours at a time every day, and when she refused to comply, he threatened her. He harassed her at all times of the day. He periodically refused treatment, barricading himself, banging his head against windows, and fighting with nurses. He capitalized on Respondent's reliance on him—for financial support and for KRN's travel paperwork—to force her to perform tasks on his

behalf. Indeed, Petitioner has controlled Respondent since early in their relationship. In total, the clear and convincing evidence here shows that Petitioner poses a grave risk of harm to his children.

Petitioner has given inconsistent testimony to those meant to diagnose him. For one, he has stated at times that his suicide threats were genuine and other times that they were tools to manipulate his parents. And he misinformed his own expert, Dr. McGuire, about his intentions for his children, telling Dr. McGuire that he desisted from seeking custody of his children—in an interview held two weeks after Petitioner began this suit, *see* Ex. 6a ¶¶ 2, 11.[10] This means that Petitioner has deliberately made it more difficult for his caretakers to properly treat him. Indeed, evidence was presented that Petitioner has threatened his caretakers and has refused treatment. Petitioner's apparent lack of self-awareness and insight, lack of candor, and resistance to treatment buttress this Court's conclusion that Petitioner poses a grave risk and intolerable situation to his children.[11]

This Court's conclusion is consistent with the holdings of various courts across this country. In *Baran v. Beaty*, 526 F.3d 1340 (11th Cir. 2008), the Eleventh Circuit affirmed the denial of a petition for return where the district court found that the petitioning father "was emotionally unstable and prone to uncontrolled destructive outbursts of rage, was physically and verbally abusive towards the child's mother in the child's presence, and physically endangered

---

[10] Petitioner testified that there must have been a misunderstanding, but this Court finds Dr. McGuire's perception to be more credible on this point.

[11] There are more independent reasons why this Court accords little weight to Petitioner's testimony. First, Petitioner was ordered to provide documents expressly reviewed by his expert, but under the guise of doing so, Petitioner instead produced non-responsive, self-serving documents that he then entered as exhibits for his own case. Second, during the trial, Petitioner repeatedly interrupted witnesses and displayed a lack of impulse control.

PAGE 18 – OPINION AND ORDER DENYING PETITION FOR RETURN

the child, both intentionally and unintentionally." *Silva v. Dos Santos*, 68 F.4th 1247, 1255 (11th Cir. 2023) (citing 526 F.3d at 1345–46). The Eleventh Circuit was explicit: the district court "was not required to find [the child] had previously been physically or psychologically harmed" to deny return. *Baran*, 526 F.3d at 1346. Rather, it just needed to find that return to the father posed a grave risk of harm to the child. *Id.* And in *Gomez v. Fuenmayor*, the Eleventh Circuit explained that threats made against a parent could be credibly seen as presaging a risk of harm to the child because "it requires no stretch of the imagination to conclude that serious, violent domestic abuse repeatedly directed at a parent can easily be turned against a child" or to foresee "the powerful effect that a pattern of serious violence directed at a parent may have on [a] child[]." 812 F.3d at 1014.

Similarly, in *Walsh v. Walsh*, 221 F.3d 204 (1st Cir. 2000), the First Circuit reversed the district court for failing to properly consider a petitioning father's history of violence and temperamental behavior. *Id.* at 219–20. As the Court summarized:

> In our view, the district court committed several fundamental errors: it inappropriately discounted the grave risk of physical and psychological harm to children in cases of spousal abuse; it failed to credit John's more generalized pattern of violence, including violence directed at his own children; and it gave insufficient weight to John's chronic disobedience of court orders. The quantum here of risked harm, both physical and psychological, is high. There is ample evidence that John has been and can be extremely violent and that he cannot control his temper. There is a clear and long history of spousal abuse, and of fights with and threats against persons other than his wife. These include John's threat to kill his neighbor in Malden, for which he was criminally charged, and his fight with his son Michael.

*Id.* The First Circuit held that the district court's cardinal error was failing to understand the implications of the above facts for the children's safety. *Id.* at 220. The First Circuit reasoned that "both state and federal law have recognized that children are at increased risk of physical and psychological injury themselves when they are in contact with a spousal abuser." *Id.*

PAGE 19 – OPINION AND ORDER DENYING PETITION FOR RETURN

*Acosta v. Acosta*, 725 F.3d 868 (8th Cir. 2013), is also instructive. There, the Eighth Circuit affirmed a district court's denial of a return petition. The district court catalogued the petitioning father's long history of "inability to control his temper outbursts," including threatening others, threatening suicide, assaulting a taxi driver, and engaging in verbal abuse. *Id.* at 876. The Eighth Circuit held that it did not matter that "there [was] little evidence that [the petitioning father] physically abused the children," because what mattered was whether the father's history proved that a return to him would pose a grave risk of harm. *Id.*

And in *Van de Sande*, the Seventh Circuit, speaking through Judge Posner, reversed a district court for failing to find a grave risk of harm. 431 F.3d 567. Judge Posner reasoned that a petitioning parent's threat of violence toward his children—understood in the context of his "propensity for violence, and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence"—amounted to a grave risk of harm to the children. *Id.* at 570.

In the instant matter, although there was no evidence that Petitioner physically abused Respondent or the children, there was evidence of coercive, manipulative, violent, and threatening behavior directed at Respondent and Petitioner's family. Such long-standing behavior constitutes a grave risk of harm to ACN and KRN if they are returned. Moreover, while the above cases focus largely on spousal abuse, Petitioner here has a broader history of familial abuse against his mother, father, and brother as well as Respondent. Thus, the circumstances here are even more concerning than the already severe facts of the cases above.

Finally, the grave risk of displacing the children is starker still when juxtaposed with depriving the children of their mother and their support network in Oregon. As the Second Circuit has explained, "the fact that a child is settled may form part of a broader analysis of

whether repatriation will create a grave risk of harm," though it cannot be categorically dispositive. *Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir. 2001), *abrogated on other grounds by Golan*, 142 S. Ct. 1880.[12] Because of the isolation of COVID-19 and Petitioner's absence from the children's lives, they developed an especially strong bond with their mother. And in Oregon, the children have family, friends, and social benefits that, if returned to Scotland, they would lose in an extremely short time frame. As Dr. Poppleton testified, losing their mother, family, and support network so quickly could have cascading effects on the children's development and health. Coupled with the risk posed by Petitioner, this clearly presents an intolerable situation and grave risk to the children.

Petitioner resists this conclusion, pointing to isolated statements in various reports about his risk to the general public, but these statements are unavailing. As Dr. Poppleton testified, statements about an individual's risk to the general public cannot be abstracted to apply to whether an individual is a risk to his children behind closed doors. And these statements largely rest on interviews with Petitioner, when as Dr. Poppleton noted, assessing an individual's risk behind closed doors requires interviews with a wide range of individuals who have interacted with Petitioner in such situations.

Petitioner also heavily relies on the testimony of Dr. McGuire, but this Court accords Dr. McGuire's testimony little probative weight. To start, Dr. McGuire relied on over 1,400 pages of documents that Petitioner failed to produce for Respondent despite multiple requests and multiple orders by this Court. Without those documents, Respondent could not properly

---

[12] Courts, however, must be "careful to establish the connection between the fact that [the children] were settled and the grave risk of harm" in returning the children, *Blondin*, 238 F.3d at 165, since the exception "is not a license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin*, 415 F.3d at 1035 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)).

cross-examine Dr. McGuire, and this Court could not properly evaluate the probative value of

Dr. McGuire's testimony about Petitioner. Although this Court did not strike Dr. McGuire's

testimony, it cannot give Dr. McGuire's testimony much weight given Petitioner's failures in

discovery. *See* Fed. R. Civ. P. 37(c).

And even putting these discovery issues aside, Dr. McGuire's expert opinion lacks

credibility. To start, Dr. McGuire testified that he was asked by Petitioner only to determine if

Petitioner had a personality disorder, not to assess the risk he poses to his children. Moreover,

Dr. McGuire states that Petitioner does not require any treatment—rather, in Dr. McGuire's

view, Petitioner's killing his mother, attempting suicide, and threatening suicide, resulted from a

unique combination of stress, anxiety, and depression that is no longer extant. This diagnosis is

simply not believable in light of all of the facts. Dr. McGuire did not believe it was "optimistic"

to have children returned to a father locked in a psychiatric facility, and he did not view killing

one's mother as an "anti-social behavior." Dr. McGuire also knew that clinicians at St. Andrew's

had a "very negative view of [Petitioner]," but discounted these views altogether. And Dr.

McGuire could not name a single report he had reviewed concerning Petitioner that "cast

[Petitioner] in a good light." Dr. McGuire testified that it was a "conflict" between Petitioner and

his parents that led to the circumstances around the killing, but he at no point addressed the fact

that Petitioner himself created those circumstances by forcing his parents to let him live with

them in Jersey beginning in Fall 2017.

What is more, Dr. McGuire's analysis hinges largely on questionable sources of

information: interviews with Petitioner, Petitioner's close friend Mr. Nick Harper, and

Petitioner's personal therapist Jane Pointon, whom Petitioner saw during the time that Petitioner

imperiled his family and eventually killed his mother. Dr. McGuire did not speak to anyone else;

he did not even talk to Petitioner's father or brother, who have restraining orders against Petitioner. He did not interview Petitioner's former employers or colleagues. His understanding of Petitioner's family history and history of violence is exclusively based on Petitioner's testimony. He did not know that Petitioner had thrown objects, nor did he know that police had been called to Petitioner's parents' home in Jersey several times—despite his claim that he had reviewed "past reports."

Further, as noted above, Petitioner seemingly misled Dr. McGuire about his intentions for the children. Dr. McGuire did not know at the time of the interview that Petitioner had filed a Hague Convention petition. And Dr. McGuire's only means of verifying Petitioner's representations, which he admitted could be self-serving, was to compare them with the representations of Mr. Harper and Ms. Pointon, and with "past reports." But it is unclear how Dr. McGuire performed this verification or weighed the veracity of different interviews. For all these reasons, Dr. McGuire's testimony lacks the credibility to overcome Respondent's evidence.

Petitioner also offered a letter by Dr. Jane Radley, a consultant psychiatrist at the St. Andrew's facility, but her letter also lacks probative value. She wrote that Petitioner has shown no intention to threaten or harm his children. But she relies exclusively on seeing Petitioner interact with the children on four occasions in a heavily monitored facility—wholly inadequate in this Court's view and Dr. Poppleton's. Dr. Radley's letter moreover does not address Petitioner's history of violent, controlling, and obsessive behavior, nor does it address the fact that Petitioner did not intend to kill his mother or cause extraordinary stress for his family but did so anyway. Dr. Radley's letter therefore holds no weight.

\*   \*   \*

In sum, the children's return to Scotland poses a grave risk of harm and intolerable situation to them. For this reason, as well as the children's lack of a habitual residence on June 17, 2022, this Court will not order that the children be returned to Scotland.

## D.  Petitioner's Proposed Ameliorative Measures Are Unworkable

Petitioner argues that this Court should order the children's return to Scotland so that he can visit them while they live under the supervision of either a live-in nanny or Petitioner's friend, Mr. Harper (who testified). This Court finds these ameliorative measures unworkable. *Golan*, 142 S. Ct. at 1892–94 (giving district courts broad discretion to consider such measures).

Because Petitioner is indefinitely detained and because the evidence, from even his own expert, overwhelmingly shows that Petitioner's confinement will only be relaxed over time, this Court holds that any ameliorative measures would require this Court to meddle with long-term arrangements abroad that this Court has no authority over. *See id.* at 1894 (instructing district courts to avoid "weighing in on permanent arrangements"). For instance, Petitioner states that he would visit his home in Edinburgh, progressing from escorted to unescorted visits. But it is unclear when or if the authorities in England and Jersey will relax Petitioner's restrictions. And Advocate David Steenson, an expert on U.K. law, testified that the Government of Scotland would need to independently permit Petitioner to enter the country even if he were permitted unescorted leave by other authorities. This Court cannot interfere in that process.

As for Petitioner's proposal of supervision by a nanny or Mr. Harper, this Court has no jurisdiction over either individual.[13] Nor is there any evidence that either individual is under the supervision of a government agency in the U.K. *See Van De Sande*, 431 F.3d at 571 ("The

---

[13] Mr. Harper has met the children twice. He does not know their ages or dates of birth. He knows virtually nothing about the children. The children do not know him.

rendering court must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned . . . ."). Given Petitioner's indefinite confinement, this Court opining on the involvement of child protective services to assure a safe return would also result in "weighing in on permanent arrangements" that the U.K. authorities must resolve. And it is highly questionable that Petitioner can afford a nanny at all: a single year (42,000 pounds) would deplete seventy percent of what Petitioner believes are his current savings (60,000 pounds). This Court thus finds such proposed ameliorative measures are unworkable. *See Golan*, 142 S. Ct. at 1894.

## CONCLUSION

In sum, this Court DENIES the Petition for Return for two independent reasons.

First, as to whether ACN and KRN's habitual residence is Scotland, Petitioner has not met his burden. Instead, a preponderance of the evidence shows that the children, ages four and two at the time of removal, lacked any habitual residence at all. Accordingly, his Petition for Return must be denied because ACN and KRN were not removed from their habitual residence.

Second, as to whether a return to Scotland poses a grave risk of harm and intolerable situation to the children, Respondent has met her burden by clear and convincing evidence. A return to Scotland would either leave the children unsupervised or under the supervision of their father who has a severe history of violence toward his own family. And this Court will not consider ameliorative measures that ultimately fall under the ambit of U.K. authorities in separate proceedings. For these reasons, too, the Petition must be denied.

**IT IS SO ORDERED.**

DATED this 24th day of October, 2023.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 25 – OPINION AND ORDER DENYING PETITION FOR RETURN